**EXHIBIT 3**

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br>1437 Bannock Street, Room 256<br>Denver, Colorado 80202 | |
| Plaintiff: DICK FAMILY TRUST NO. 1<br><br>v.<br><br>Defendants: LAND SECURITIES INVESTORS, LTD., et al. | ▲COURT USE ONLY▲ |
| *Attorneys for Court Appointed Receiver:*<br>Robert W. Hatch, II, #16888<br>Brian T. Ray, #34914<br>HATCH RAY OLSEN CONANT LLC<br>730 17th St., Suite 200<br>Denver, Colorado 80202<br>(303) 298-1800<br>rhatch@hatchlawyers.com; bray@hatchlawyers.com | Case Number: 2019CV31247<br><br>Division: 275 |
| **RECEIVER'S MEMORANDUM REGARDING QUESTIONABLE TRANSACTIONS** | |

Andrew S. Miller, as Court Appointed Receiver, through his undersigned counsel, hereby submits the following Receiver's Memorandum Regarding Questionable Transactions.

**A. RECEIVER'S DISCLOSURE TO THE COURT OF ALLEGED IMPROPRIETIES AND ANOMALIES.**

During the Receiver's review of the financial statements, as well as the review of assets owned by Land Securities Investors, Ltd. ("**LSI**") and Sunset Management Services, Inc. ("**Sunset**"), it has become clear that there was a sustained, and directed effort to remove assets from LSI's balance sheet. In 2001, the total assets on LSI's balance sheet aggregated over $71 million. Today, the Receiver believes the liquidation value of the remaining assets of LSI and Sunset is approximately $11 million.

The Receiver has reviewed all of the accounting records available, including tax returns. In addition, Receiver has endeavored to interview all professionals involved in this situation, as well as all personnel involved with LSI over the years. The anomalies and alleged improprieties generally fall into the following categories:

1. The unexplained removal of assets from the balance sheet;

2. The state of disarray in the books and records;

1

3. Memos and emails documenting the need for money from LSI;

4. Outline of various schemes to move money from LSI and others to offshore trusts and entities;

5. The establishment of fictitious debt created on LSI's balance sheet for nefarious purposes.

Many unexplained and/or improper transactions emanated from a money manager by the name of La Houge Boete Fiduciare Societe avec Responsibilite Limitee ("**La Houge**"). La Houge is apparently a money management firm located in Jersey in the Channel Islands. Sometime in the late 1980s or early 1990s, La Houge began to oversee and manage the two partners of LSI, Dick Family Trust No. 1 ("**DFT1**") and Dick Family Trust No. 2 ("**DFT2**"). In addition, La Houge during that time frame, also oversaw LSI. There were several employees or representatives of La Houge that exercised direct authority over the operation of the trusts at that time. Richard Wigley, a purported employee of La Houge was a primary contact with La Houge and was extensively involved in the operation and administration of LSI and the two trusts, DFT1 and DFT2. At various times, Richard Wigley purported to be the Trustees of the international trusts known as the Russian Trust and the Manor House Trust (collectively, the "**International Trusts**"). DFT1 and DFT2 have advised the Receiver the International Trusts were initially setup in order to fund the real property acquisitions of LSI in the United States of America. The International Trusts would advance the funds necessary to acquire the real properties and LSI would execute a promissory note in favor of the International Trusts and/or La Houge. When payments under the promissory notes were due, LSI would send funds to the International Trusts and/or La Houge and the resulting distributions from the International Trusts were apparently made on a tax reduced basis.

In or around 1995, Alan Fishman was hired to manage LSI, and documents indicate he was a direct employee of La Houge as well. Mr. Fishman, when hired by La Houge, became the trustee of DFT1 and DFT2. In addition, he was named as the president of Sunset, who was in turn the general partner of LSI, which was a limited partnership. Therefore, after 1995, Mr. Wigley and Mr. Fishman exercised near total control over the International Trusts, DFT1, DFT2 and LSI.

As the Receiver began reviewing documents related to the operation of LSI, it quickly became apparent that La Houge was playing a major role in the operation of LSI and the administration of DFT1 and DFT2. Furthermore, the Receiver has located correspondence, and memos that illustrate that La Houge was, in fact, more than a money manager. La Houge, in their own words, outlined systems and plans to move money for their clients. In some cases, it is clear that La Houge provided facilities and advice on how to move money, without the burden of taxation, or regulatory supervision, from one country to another.

B.  **THE UNEXPLAINED REMOVAL OF ASSETS FROM THE BALANCE SHEET.**

The Receiver reviewed and traced each asset on the balance sheet starting from 2001 through 2017 and sought to understand the status and ultimate treatment on the balance sheet. Receiver noted that there were many instances whereby assets were simply removed from LSI's balance sheet. In many cases, assets disappear from the balance sheet without explanation. In addition, many assets were increased in value or decreased in value with no explanation. Even more troubling is that these assets, in many cases, were shown to be distributions to DFT1 and DFT2. However, Receiver has confirmed with both DFT1 and DFT2, that except for 2018 and 2019, DFT1 and DFT2 received nothing from the assets missing from LSI's balance sheet. It appears that the equity section of the balance sheet was used as mechanism to move money from LSI to third parties, including to offshore trusts such as the International Trusts.

In one case, the Receiver has pinpointed, and confirmed an apparent theft of an asset from LSI's balance sheet. On December 31, 2010, there was an asset on LSI's balance sheet of $2.8 million, an entity known as 17th 3rd LLC. 17th 3rd was an LLC that owned only one asset; a condominium unit on 3rd avenue in Denver, Colorado. On January 1, 2011, this asset was removed from LSI's balance sheet without explanation or remuneration by charging off the assets to DFT1 and DFT2. The ownership of 17th 3rd LLC was then transferred via an unrecorded transfer, to Alden LLC, which was an LLC owned solely by Alan Fishman. In 2013, LSI filed for bankruptcy, and 17th 3rd LLC did not appear on any bankruptcy schedules. In 2014, Alden sold the 17th 3rd LLC entity through a sale of membership interests for $4.0 million to Layher, a German entity. As part of the sale, Alden placed a first mortgage on the condominium for $2.7 million as seller financing. Layher is apparently affiliated with a principal by the name of Louise Layher, a known ex-girlfriend of John Dick Sr. Thereafter, 17th 3rd LLC sold the condominium unit in 2017 for $3.75 million to a third party whereby Alden's note was repaid and Alan Fishman signed the closing documents as the manager of 17th 3rd LLC. This entire transaction appears to be a removal and re-sale of what was an LSI asset, with no benefit flowing to LSI, DFT1 or DFT2.

In addition, Receiver has noted many cash transfers that are not explainable nor are they documented anywhere. In one case, the Receiver noted a wire transfer from the Centennial Village Development LLC asset. This asset is a vacant piece of land in Loveland, Colorado, and in 2003, the Receiver noted a wire transfer of $199,873 to an entity offshore. The description used in the wire transfer was "outbound wire (international) nothing to do with Centennial". These are dubious transactions that the Receiver cannot explain.

C.  **THE STATE OF DISARRAY OF THE BOOKS AND RECORDS.**

The books and records of Sunset and LSI are in a state of disarray. Receiver has done extensive reviews of all books and records of the two entities, including the affiliated entities. The books and records are in terrible shape. There are notable records that are completely absent from any accounting. For example, there were several years where extensive journal entries were made on January 1 or December 31 without any explanation. In fact, these journal entries were not in the financial records so the ending balances of one year do not tie out to the starting balances the following year. These journal entries, in many cases, write assets up or down, and

fabricate changes to the value of LSI's assets. In addition, in many years, the books and records reflect many millions of dollars in distributions to the DFT1 and DFT2 that never occurred. The Receiver has been unable to trace where those funds ended up.  Receiver received specific reports from a former employee that there had been deliberate efforts to destroy or abscond with documents and files.

### D. MEMOS AND EMAILS DOCUMENTING THE NEED FROM MONEY FROM LSI.

The Receiver located memos and emails documenting the need for money. In most of the cases, memos and emails were sent by Richard Wigley to his colleagues, outlining the need for funds to be sent from LSI to La Houge, and other entities, such as the International Trusts. In one case, Mr. Wigley sent a schedule regarding the money sent to John Dick Sr. over the years, of over $19 million.  Many of the assets described on this schedule were LSI assets.

In another case, Mr. Wigley through a memo, outlines the need to "create" documents that either did not exist or were lost. Mr. Wigley cautions the recipient to use extreme caution when creating the new documents. The recipient was to pay close attention to the type of ink used, the type of paper used, to destroy the originals and send copies, etc. These memos and emails demonstrate an undocumented relationship between various parties, which had at its purpose the intention to remove LSI assets and move them to others.

### E. OUTLINE OF THE VARIOUS SCHEMES USED TO MOVE MONEY FROM LSI TO OTHERS.

Receiver located a document promulgated by Richard Wigley and La Houge. This document purported to outline various ways that a client could enlist the assistance of La Houge in order to plan and execute various schemes to move money to various jurisdictions without the fear of regulatory oversite, and especially to avoid taxation. Many of these schemes outlined in the document, were employed in moving money and assets from LSI to parts unknown. While Receiver was unable to pinpoint the exact methodology used, it is clear that these schemes were employed by La Houge and other collaborators to remove assets from LSI.

In addition, it appears that La Houge and Mr. Wigley were engaged in the business of selling this type of service to others. There are many names that appear in conjunction with the La Houge "playbook". Receiver saw many names of participants in various emails and memos. Some of these names appear in payments and receipts made on LSI's books. It appears that LSI was used as a part of the services to third parties in order to move money to the detriment of LSI and its partners.

### F. THE ESTABLISHMENT OF FICTITIOUS DEBT ON LSI's BALANCE SHEET FOR NEFARIOUS PURPOSES.

While testifying under oath, Richard Wigley acknowledged that he had created artificial promissory notes in concert with Alan Fishman, to in effect, loot LSI of assets. The two participants, would create notes that were completely fictitious, and as assets of LSI's were sold, money was remitted to La Houge to retire this fictious debt. There was one instance whereby the

Dick Family borrowed money and lent the funds to an entity controlled by Fishman and Wigley (3NP LLC) for the explicit purpose of purchasing legitimate debt of LSI. Approximately $4.1 million of LSI debt was purchased for $1.9 million. European assets were sold and the initial $1.9 million was repaid, however, 3NP LLC did not release the deeds of trust securing LSI assets. 3NP pursued the collection from LSI assets even though the underlying debt was repaid and even filed apparently false claims in LSI's bankruptcy claiming to be owed additional funds despite having received payment previously. This appears to the Receiver to be a strategy used to remove assets from LSI and apparently went on for years.

## G. CONCLUSIONS OF THIS SITUATION.

1. Receiver concludes that the actions of various participants in LSI over the years were grossly negligent, at best. At worst, much of this conduct may be criminal in nature. Over many years, there has been an organized, and relentless effort to remove LSI's assets. The various participants have neglected to keep any sort of dependable records of transactions. In fact, it appears that all efforts have been made to obfuscate the books and records purposely.

2. In 2016, and 2018, as a result of litigation between the parties, releases were signed by the various parties and the payment of money was made. There are now controversies between the parties as to the scope of the releases that were signed. The Receiver is exploring ways to obtain clarification from the courts with respect to the scope of the release of the 2016 Settlement Agreement. In the meantime, and until the court instructs otherwise, Receiver is acting in accordance with both the 2016 Settlement Agreement and 2018 Settlement Agreement.

3. Receiver has voluminous documentation of many unexplained transactions and/or money transfers not included in this report. Attached as <u>Exhibit 1 and Exhibit 2</u> are Discovery Responses submitted by both DFT 1 and DFT 2 in connection with litigation against Alan Fishman and others where the DFTs outline their understanding of many questionable transactions. In many of these cases, the Receiver believes laws and regulations may have been broken. The Receiver proposes to resolve this component of its duties by reporting the entire situation to law enforcement. The Receiver seeks further direction from the Court on how to further to investigate these matters.

***SIGNATURES ON FOLLOWING PAGE***

Respectfully submitted this 24th day of June, 2020.

          ANDREW S. MILLER, as Court appointed Receiver for Land Securities Investors, Ltd. and Sunset Management Services, Inc.

          By: */s/ Andrew S. Miller*
              Andrew S. Miller

*In accordance with C.R.C.P. 121 §1-26(9), a printed copy of this document with original signature(s) is maintained by Hatch Ray Olsen Conant LLC, and will be made available for inspection by other parties or the Court upon request.*

HATCH RAY OLSEN CONANT LLC

By: */s/ Brian T. Ray*
    Brian T. Ray
    Attorneys for Receiver

*In accordance with C.R.C.P. 121 §1-26(9), a printed copy of this document with original signature(s) is maintained by Hatch Ray Olsen Conant LLC, and will be made available for inspection by other parties or the Court upon request.*

## CERTIFICATE OF SERVICE

The undersigned certifies on the 24th day of June, 2020, the foregoing **RECEIVER'S MEMORANDUM REGARDING QUESTIONABLE TRANSACTIONS** was filed under seal via the Colorado Court's E-Filing System.

          */s/ Candle Maulin*
          Paralegal

*In accordance with C.R.C.P. 121 §1-26(9), a printed copy of this document with original signature(s) is maintained by Hatch Ray Olsen Conant LLC, and will be made available for inspection by other parties or the Court upon request.*